**Rose A. DILLENSCHNEIDER**
Plaintiff
vs.
**Richad SAMUELSON, Postmaster
Brockton Post Office, Defendant**

No. 77-3230-A

United States District Court
Commonwealth of Massachusetts

November 23, 1981

**William J. Lafferty, Esq.,** counsel for plaintiff.
**3-4584 Sp AUSA George Eng,** counsel for defendant

### MEMORANDUM OF FINDINGS
### and
### ORDER

Plaintiff, Rose A. Dillenschneider, a female, and former distribution clerk at the Brockton, Massachusetts Post Office, brings this suit against the Brockton Postmaster, Richard Samuelson, under 42 U.S.C. § 2000e-2 (Title VII), charging sex discrimination in the form of harrassment and abuse, emotional and physical. Because of the thirty-day complaint requirement[1] the actual charge is confined

1. The complaint was duly filed, and although in-

to the events of March 4, 1977; but evidence was taken as to a long series of alleged earlier events for the purpose of showing the background and a possible interpretation of March 4 activities.

Plaintiff produced two witnesses. The first, one John Bercury, a former postal employee, union official, and EEO counsellor, testified to the fact that plaintiff had made several complaints from 1975 to 1977, and that he visited the post office and talked with supervisors, and at least once with the Postmaster. Plaintiff's only other witness was herself. Defendant produced eight witnesses. As a preliminary comment, some of these gave stories that persons far less cynical than I would have difficulty in accepting. All, except for one who is now retired therefrom, are presently employed at the Brockton Post Office. Whether their motives were to keep their jobs, camaraderie, dislike of plaintiff, or simply not to be rat-finks, as one witness explained his own silence in a matter, I cannot say, but they made it easy for me to be certain what occurred.[2]

Plaintiff testified that in March, 1977, and for several years prior, she was on the early morning shift in the customers' lock-box section. At that time she was in her middle 50's and unmarried. She was, perhaps, over-weight; at any rate, she was a large woman. Earlier, she had served in the Marines. There appears to have been no love lost between her and her co-employees. In all frankness, since the matter is relevant, I will say that this is understandable.

On the morning of March 4, plaintiff testified there were various other employees in the box section, including Kenneth Parent and Clayton Paulding. These two were only partially assigned to the box section, plaintiff and Frank Brazas being the only two that were full-time assigned. Plaintiff testified that Parent pushed a gurney, a small cart, into her; that she ignored it; that he threw mail to be stored at her; that later, within a customer's hearing, he charged her with offensive sexual activities, and thereafter called her an asshole. Later, in her opinion deliberately, he pushed a large steel tray cart into her, dragging her three feet, and causing her to get tangled up with a gurney and causing various physical injuries. She went to her supervisor, Alfred Matta, and asked for medical slip, but he said that he did not see that she was hurt, and refused, telling her to go to the office. She went to the office, and a Mr. Burke said, what is the matter with him, and instructed Matta to give her a slip. She drove her car to the hospital. She did not return to work, and received government workmen's compensation for total disability for 2 ½ years and is now on partial and still under a doctor's care. Prior to March, 1977, plaintiff had been on veteran's, and on work related, partial disability. This did not interfere with her working an eight-hour day, but precluded overtime.

Except for statements by Matta and some others that plaintiff had not appeared to be hurt, there was no contradiction of her testimony that she was injured in the legs, stomach, shoulder, arm, and hand, and had a broken tooth and a cut lip. Presumably the hospital records and the government workmen's compensation file would have furnished full opportunity for medical contradiction, if any there were.

While there was no previous such physical episode, plaintiff testified at length to earlier harrassment. This included other offensive name-calling, remarks about her alleged sexual activity of improper sorts during her service with the Marines, and reflections on her

_____

vestigated, was not acted upon, and suit was brought after the requisite 180 days.

2. One incident deserving a footnote: Defendant requested that plaintiff's prospective witnesses be excluded from the courtroom, not realizing that plaintiff was to be her second and last witness. In turn, defendant excluded his own witnesses. Thereafter, one of his later witnesses made a statement that I find evidenced that he had been talking with a prior witness. There was no law against this, but it is rather an empty show to offer to exclude witnesses, and then have them, or at least permit them, to be filled in.

weight and stupidity. On three prior occasions she was shown pornographic pictures. To the extent that all this was true, and I find that at least much of it was, it demonstrated the maturity level of her fellow employees as something short of high school. Without in any way reflecting on plaintiff, I cannot think, particularly in these days of women's emancipation, of her being embarrassed. On the other hand, the conduct was intended to be, and was, annoying and insulting and highly offensive.

Plaintiff testified that she complained frequently to Matta, and that on occasions he said he was sick of hearing from her. At least once she also complained about the poor treatment customers were receiving.[3] She complained twice to Robert DeCosta, and early in February 1977 complained to the Postmaster. Thereafter the Postmaster told her that she was all right, and that he had put a stop to this business. Plaintiff testified that the only annoyers were Parent, Paulding and Brazas. After her complaint to the Postmaster, they did not cease their improper conduct, and Parent's increased. On the morning of March 4 she complained to Matta, prior to the tray cart episode, and Matta again told her he was tired of her complaining, and to keep away from Parent and handle the junk mail. As a result of her doing this she was criticized by Paulding for not attending to First Class.

On behalf of the defendant,

**Alfred Matta** testified that plaintiff came to him on March 4 and complained of an accident caused by Parent; that he offered her a form, if she was hurt; that she said she was not, and left; that he went and spoke to Parent; that she came back with William Burke, the safety officer, who asked for a form, which he gave her; that she did not appear to be hurt or in pain; that she had complained to him quite frequently before about other workers, but when he would speak to them, and inquire about harassing, it was always simply her word against theirs.

On cross-examination Matta testified that plaintiff had complained more than twenty times; that all she said was "harassment;" that she did not tell him the insulting words, and he did not ask.

While plaintiff's counsel, in oral argument, commended this witness for telling the truth about the number of complaints, on this picture I can commend him on nothing else. I have spoken of plaintiff's injuries. Why would she say she was not hurt, and did not want a slip, and then go ask someone else? How could he go back to the other employees from time to time without having inquired what they were supposed to have done? Indeed, could it be thought that plaintiff would not have told him in the first place?

**Frank Brazas** admitted he was not on speaking terms with plaintiff, but denied the charges about making rude comments about her weight, and of showing her dirty pictures. He testified that neither Matta nor anyone else ever spoke to him about harassing plaintiff; that he never said anything to plaintiff of a sexual nature.

**Clayton Paulding** conceded that he once called plaintiff stupid, but denied that he ever said anything to her relating to her sex, or made any derogatory remarks because of her being female. On March 4 he heard plaintiff say that Parent hit her, but he did not know to what she was referring.

**Kenneth Parent** testified that on the morning of March 4 plaintiff was sorting the mail incorrectly; that she was always doing this; that he would have to do it over; that they had many disagreements; that they had an argument that morning; that he pushed all four tray carts that day, but none into her. He testified that Matta never asked him if he harassed plaintiff; that he had disagreements with everybody; that he often swore at men, when he was mad, and used vulgar words, but very seldom to women; that he was a little mad that morning; that he

---

3. See also Exhibit 6, post.

had once told the plaintiff her nephew was queer. Parent was 30 years old. In Exhibit 6, post, he was referred to as a kid. I would concur, and add, in spite of the Assistant United States Attorney's personal endorsement, an untruthful one.[4]

**Janice Mascari** testified to her rising through the ranks of Brockton to a management position, and that there were approximately four other such women; that she had never heard of sexual harassment in the post office. I believe her, and find the total absence of any evidence that any women, other than plaintiff, had ever claimed discrimination, to be serious flaw in plaintiff's case.

**Richard Samuelson,** the defendant, the Brockton Postmaster, testified that plaintiff complained to him of harassment by co-workers in the winter of 1977; that she had not done so before; that he asked a subordinate, Robert DeCosta, to investigate through channels and report; that Exhibit 6, of which he had received a copy, was DeCosta's request for a report; that he thought the matter was concluded.

The pertinent part of Exhibit 6, addressed to Manager F.A. McCann of February 4, 1977, is as follows:

"On February 2, 1977, Rose Dillenschneider was in to see the Postmaster. She is complaining once more about the way she is treated by her fellow workers in the box section...

"She is complaining about remarks made by Ken Parent relating to all she does is bite her fingernails and pick her nose. There is also an allegation that when she comes into the box section, remarks are made such as, 'here comes stink' or 'stink is in the air.' She has complained to two supervisors, both Mr. Matta and Mr. Cruise. Allegedly, Mr. Cruise said, 'the kid will not keep his mouth shut' but he was not going to do anything about it.

"In addition to these incidents, Rose also alleges that box rent notices have not been put in since October. Also, that Frank keeps the desk drawer locked and she has no access to it on Saturdays. She also told a story about bottles of liquor coming over the counter at Christmas time and alleges that Clay and Frank said, 'you don't drink, we'll give your bottle to Kenny.' "I think this whole problem in the Box section pertaining to Rose and the manner in which she is treated has gone on far too long. These employees are paid to do a job. If they can't do that job and keep their mouths shut, then the supervisor has the responsibility and the authority to take corrective disciplinary action.

"Just who the hell is running the box section anyway? If you Mr. Cruise can't get this problem straightened out, please advise me. I will take direct action in the box section myself and then take the necessary corrective action with you and Mr. Cruise.

"I expect the information I have requested, plus your plan and time table for resolving this whole problem
R.J. DeCosta
Director of Customer Services
cc: Postmaster"

**Robert J. DeCosta** testified that Cruise was a supervisor under him; that he told Cruise to get the employees together and give them a lecture. On cross-

---

4. In his closing argument the Assistant U.S. Attorney said of the witness,
"Now Mr. Parent's testimony I thought was quite honest and I thought it was above board, and I thought it was very direct."
In the light of a long line of First Circuit cases pointing out that for counsel, particularly the U.S. Attorney, to express a personal opinion is highly improper, see, e.g., **United States v. Gonzalez Vargas,** 558 F.2d 631,633 (1st Cir. 1977), I am at a loss to know which of a number of inferences, none acceptable, I am to draw in this particular instance.

examination he testified that he did not know whether plaintiff's complaints were true or not.

**William S. Burke** testified that plaintiff came to him on March 4, and asked him for a medical form; and that he went with her to Matta to get one. He did not observe any injuries to her person.

### Recap

On this record I cannot doubt but that something serious happened to plaintiff physically on March 4, or that it was anything other than a deliberate shove of a heavy tray car by Parent. Except for some who said she did not appear to be hurt, eight witnesses have been unable even to suggest anything else. I find it happened as plaintiff said, and accept her other testimony of what occurred that day.

The next question is the responsibility of defendant Postmaster for the conduct of his subordinates--requiring knowledge, or proof of carelessness after knowledge of a substantial possibility of misconduct. Defendant testified that he assumed that his February instructions had taken care of the matter. If this had been an isolated event, I would accept such an assumption as sufficient. It was far from that, as defendant, by reading Exhibit 6 would well know. This paper was not expressed in terms of questioning, or calling for investigation of, the accuracy of plaintiff's many complaints. Rather, their validity was fully recognized. So, also, was the likelihood that the cure was not going to be easy, see last sentence of second paragraph, and that there was to be a report back. Either defendant did not think the affair serious to begin with (which I doubt) or he was content to wash his hands of it after one instruction. I find this totally insufficient attention to clear himself in a Title VII case with this background. I further find that if defendant had requested a further full report he would have learned that nothing had been accomplished.

Unfortunately for plaintiff, however, she has one more hurdle, indeed, the biggest. This is not a Federal Tort Claims case for personal injuries, but a suit under Title VII. Although there are many statutory provisions, they all are cast in terms of "discriminate against an individual because of...sex." 42 U.S.C. § 2000e-2. Plaintiff says that the issue is not intent but result; she was a member of a protected class, she was injured, and that is enough. It is not enough; the injury must have resulted from discrimination. It is true that in some cases the result itself shows the discrimination without the need of separate proof of intent, but the mere fact that it is a woman that is hurt does not show discrimination on its face. In the present case a woman was injured, and deliberately, but not because she was a woman. I find that for reasons, good or bad, this was simply a personality clash, and the fact plaintiff was a woman was a mere happenstance.

Where personal dislike, unconnected with gender, was the motive,[5] the fact that some of the means of expressing it may have relied for their greater effectiveness upon the fact that she was a woman, in this circumstance, is immaterial.

The complaint is dismissed.

**Aldrich, Senior Circuit Judge***

\* Sitting by designation

---

5. If Parent was known to be disagreeable and obnoxious to a number of women, but not to men, we would have a different case.